Argued March 18; affirmed September 9; rehearing denied
November 25, 1930.

# WEBB ET AL. *v.* WOODCOCK ET AL.

(290 P. 751)

*John M. Pipes* of Portland (Martin L. Pipes and George A. Pipes both of Portland on the brief) for appellant.

*Albert H. Tanner* of Portland (J. J. Johnson of Portland on the brief) for respondents M. Webb, Waggoner and Anderson.

*George A. Hall* of Portland (on the brief) for respondent Kincaid.

McBRIDE, J. The first matter for consideration, laying aside for the present the question of the statute of frauds, is whether the plaintiffs have proved the existence of the agreement which they seek to enforce.

James H. Palmer and Laura M. Pattison were married in the year 1900. Palmer was a widower without children and Mrs. Pattison was a widow with three daughters, Stella, then about 12 years of age, now Mrs. Webb; Lois, then about 9 years of age, now Mrs. Waggoner, and Sylvia, then about 7 years of age, now Mrs. Anderson. Neither party to the marriage had any considerable property. They were working people. For the first three years or so, they moved from one location to another in Portland and finally entered into a contract to purchase a ten-acre tract in southeast Portland on the installment plan, each contributing part of their earnings to pay the installments, and when the purchase was completed, a deed was taken running in their names as grantees as husband and wife whereby an estate in entirety was created: *Noblitt v. Beebe*, 23 Or. 4 (35 P. 235). After the contract of purchase of the tract, they built a house upon it, the husband working for a time in a sawmill and later in a nursery, and the wife in a laundry, and the girls going to school for a time and attending to the household work. Several acres had been cleared and planted in strawberries, which the girls assisted in cultivating and picking, and also assisted, to perhaps a very limited extent, in clearing up the land. On the clearing the father started a nursery and the mother finally gave up working in the laundry and devoted herself to raising chickens, having increased her stock from 1,500 to 2,000 choice hens from which she sold young chickens and eggs for several years. The family, though poor, were frugal and

prosperous in a small way. The girls, as they grew up, went to work in department stores and other occupations and while they remained at home, contributed in a small way, perhaps $2 a week, to the family purse, reserving the remainder of their wages, which were small, perhaps $6 a week, for clothes and incidentals. Altogether the evidence discloses a picture of a happy, industrious and harmonious family, each member doing his or her part to put the household on the way to prosperity. The husband and wife lived on terms of affection for each other. The children loved and respected the father and he treated them in all respects as a father would treat his own children. Finally, some three years later (the testimony is woefully deficient in dates) Palmer gave up his nursery business. The tract was laid off in lots, which seems to have met with a fair sale at fair prices. It is an evidence of the wonderful growth of Portland that in 1925 some of the lots, of which there were 48, sold for nearly as much as the whole tract cost the Palmers in 1900, and that the remaining unsold lots, 28 in number, were appraised at James H. Palmer's death at $12,575, and that his estate, which was nil in 1900, was estimated as a whole at $23,000 apparently derived in the most part from transactions in relation to the property which cost him and his wife $1,000.

To resume, the daughters grew up and were married; Stella, Mrs. Webb, married in 1907. Lois, Mrs. Waggoner, and Sylvia, Mrs. Anderson, married in 1911. Mrs. Webb and her husband moved to Kelso, Washington, after their marriage, but Mrs. Waggoner and Mrs. Anderson remained in Portland and resided near enough to their mother and stepfather to be in constant intercourse with them, and the relation of

the three daughters to their stepfather continued on about the same terms as if they had been his natural daughters under like circumstances.

There is considerable testimony from plaintiffs to the effect that on several occasions Palmer, in conversation with them, told of the progress he was making in sales of the property, and that on one occasion his wife intimated that he was bragging, to which he responded that he did not mean to brag, but that the girls would get it sometime and that it was proper for them to be informed of the condition of the business. All the plaintiffs contend that there was a family understanding that the property, when the old folks were through with it, would go to the daughters. Of course, this is unimportant as a basis of title or right in the property, but has some value as bearing upon the motives that may have led up to the making of the promise that Palmer afterwards made to will his estate to plaintiffs.

About two years before her death on August 31, 1926, Mrs. Palmer's health began to fail, the poultry business was given up and it is but reasonable to assume that the real estate transactions were managed by Palmer. It is during this interval that for the first time we find notes and mortgages made payable to James H. Palmer and Laura M. Palmer "or the survivor", perhaps with a view to Mrs. Palmer's failing health. It is evident that Palmer, and perhaps Mrs. Palmer, believed that the tenancy by the entirety continued in the moneys and personalty received for the lots, and that all along, after his wife's death, he was under the same impression until otherwise informed; that he honestly believed that upon his wife's decease all the moneys, notes, contracts and mortgages

received for lots sold became his property and that no administration was necessary. Palmer was an honest and a just man and had no intention of defrauding any one, and it seems probable, we think, from the testimony, that he always had in mind that his step-children should in the end be the beneficiaries of what was left of the proceeds of the ten-acre tract after he was through with it.

On August 31, 1926, Mrs. Palmer died. The children having only hazy ideas of the descent of property and knowing perhaps nothing of an "entirety" naturally supposed that their mother's interest in the property devolved on them as would have been the case where she owned a separate interest as tenant in common with her husband. One of them went to Mr. J. J. Johnson, an attorney and master of the grange to which she belonged, and consulted him, perhaps rather informally, about the situation and got some information from him as to what interest Mrs. Palmer's heirs had in the property and its proceeds, to the extent at least of their being informed that they had some interest and that their mother's estate should be administered upon to make things regular. Mrs. Anderson had some conversation with him about the matter and Mr. Anderson, her husband, went to him and had a more extended conversation to the effect, so he testifies, that his wife and the other sister had been told by Palmer that he contemplated calling in some mortgages and investing the money in other property and that at their request he went to see Palmer. He testified further as follows:

"A. I went down to Mr. Palmer's place one morning before I went to work, about seven o'clock in the morning, and he was out in the backyard and I told him I had come down to talk to him. We sat down on the

back steps of his home there and I asked him if he realized that there was some legal procedure to go through with in regard to his wife's estate. He said, 'No, I don't know as I had.' He says, 'Is there?' I said, 'Well, yes, there is. I am advised by an attorney that there should be an administrator appointed within 30 days after the time of a person's death.' He asked me if I thought that was right. I told him, 'Yes, as far as I know, it is.' He asked me another question, I believe, if the girls thought there was an estate there to be administered and I told him yes, they thought so too. He said well, he supposed that when his wife died, that everything went to him, that he would carry on just the same as he always had. I told him possibly the best thing for him to do then was to seek the advice of an attorney and find out for himself as to what he should do. He had told us before that he was calling in some mortgages with the expectation of using the money he would get from the mortgages to buy an equity in a piece of property. I told him at that time I didn't think that he could do that without first having the estate administered and that it would save him trouble later on if he carried it through in a proper manner. That was about the extent of our conversation.

"Q. Well, now, in that conversation were there any words between you or any hard feelings created by what had occurred there between you?

"A. No, I can't say that there was.

"Q. Did you intimate to him that he was criminally liable or that he could be prosecuted, or anything of the kind?

"A. No, sir, absolutely not.

"Q. Or did you make any threats of any kind?

"A. No, sir.

"Q. It was just a friendly talk with him?

"A. Yes. I thought that he was going ahead and doing things without advice and that he would appreciate it if he knew that he was doing those things, that he would appreciate the advice. I don't think he had given it a thought at all.

"Q. Well, had you previously to talking to him, talked to your wife and the other plaintiffs about it, his stepdaughters?

"A. Yes, I had. On one occasion I talked to the wife about it. She had talked to her sisters, I believe.

"Q. Well, did they arrange with you to go and see him?

"A. They did.

"Q. Was it at their suggestion, in other words, that you went there to talk to him about it?

"A. It was with their suggestion that I went to talk with him, yes.

"Q. What do you know as to the fact as to whether they had in mind protecting their interest in their mother's estate as well as seeing that he got right in the matter?

"A. They certainly did have it in mind. They wanted to protect their rights in their mother's estate and to see that he didn't get into trouble himself, and expense of straightening out a tangle that might come up later on.

"Q. Do you know what he did with reference to that matter afterwards?

"A. He stopped in to the house one evening and told us he had been to see an attorney and found out that the estate had to have an administrator appointed and that he had been appointed administrator of the estate."

■■ This discussion led Palmer, who at that time had probably supposed that the whole of his wife's estate, personal and real, devolved upon him absolutely after her death, to make inquiry as to his right, and as a result he discovered that the heirs had an interest therein which required administration, and, accordingly, proceeded to have himself appointed administrator. In due time he filed an inventory and appraisement which showed the total value of her estate in the personal property to be $3,105.83. This result is

obtained by the appraisers omitting two items. First, a note and mortgage of A. M. McClamrock and wife to James H. Palmer and Laura M. Palmer, husband and wife, as joint tenants, a description of which is in the inventory as follows:

"A. M. McClamrock and Ruth E. McClamrock, husband and wife, to James H. Palmer, and Laura M. Palmer, his wife, as joint tenant with right of survivorship, dated May 6th, 1925, recorded May 6th, 1925, Book 1052 M. P. 155, payable three years after date— int. 7 per cent payable quarterly. Covers lot 17, block 60, Selwood, Mult. Co., Oregon, amount of note, $2,100.

"(This note and mortgage is payable to the survivor, and James H. Palmer is survivor of Laura M. Palmer, deceased)"

Second, another note and mortgage listed in the inventory as follows:

"Clyde A. Curtain and Ollie M. Curtain, his wife, to James H. Palmer, and Laura M. Palmer, husband and wife, or the survivor, dated March 5th, 1924, recorded March 10th, 1924, Book 948 M. P. 216, payable in yearly instalments of $300, or more. Int. 7 per cent semi-annually, covers lot 11, Gaston Tract, Multnomah County, Oregon. This note and mortgage has been paid down so there is a balance due on same on Sept. 1st of _____$ 975.00 and some accrued interest on Aug. 1st.

I collected on said note and mortgage, principal,   25.00
Interest,   5.83

$1,005.83

"(This note and mortgage is payable to the survivor, and James H. Palmer is the survivor of Laura M. Palmer.)"

These two mortgages were not appraised as being properly the property of the estate. While inventoried as such, the appraisers and their attorney evidently looked upon them as an entirety which passed

to the survivor. Whereas, notwithstanding the language used, Palmer and his wife were tenants in common and the estate of Mrs. Palmer was entitled to a one-half interest; but, as the heirs of Mrs. Palmer were disposing of all their interest, the distinction is of no practical importance except as indicating the value of the consideration they were exchanging for Palmer's promise to make a will in their favor. There is no attempted accounting for Mrs. Palmer's share of the money received during her lifetime, but it may well be that these moneys were expended for the support of her husband and herself.

■ If it is true that the promise to will the property to his three stepdaughters was made by Palmer, there is no reasonable question as to the adequacy of the consideration. The plaintiffs were giving up a real and tangible interest in property which the decedent himself (and he knew) admitted was of considerable value, so valuable that he was greatly disturbed at the prospect of being required to call in mortgages in order to raise money to make good the interest of the daughters in their mother's estate in exchange for which they had agreed to take what he might have left when he should die. If he kept up the value of the estate, it might be a considerable sum. If he lost or wasted his money or married unfortunately, it might be less than nothing. He was apparently strong and well and with a considerable expectation of life, and, on the other hand, subject to its vicissitudes of fortune. The one "lucky strike" that he had made in his 57 years might be replaced by ill luck or disastrous investment.

No business man looking at the situation with the cold eye of speculation would have ventured $500 on Palmer's bare oral promise to leave him his estate at

his death. Much less, would he have ventured such an interest as the heirs of Mrs. Palmer believed, in an indefinite way, that they had, and which Palmer seemed disposed to admit by his bare promise to leave them his property at death. He fairly put this uncertainty before them.

Mrs. Waggoner testified that on the occasion of the agreement on his part to make a will Palmer said to Mrs. Webb:

"Supposing I should get sick and have to use all this, then what? 'Well,' she said, 'if you have to use it in that way, if it should have to go in that way, why, you use it, but,' she said, 'we hope you will live to a good old age.' * * * Well, the tears came to his eyes and he said: 'Well, you girls are better than I had been led to believe.'"

We see no disparity or hardness in the bargain so far as Mrs. Palmer's heirs are concerned.

Was the agreement alleged in the complaint actually made? At the risk of prolixity, we will give part of the testimony of Mrs. Webb as to what occurred at the meeting when the terms of settlement between the parties were agreed upon.

"Q. Well, now, you may state to the court what occurred at that time at that meeting there. First, state who all were present at the first part of the conversation.

"A. There was Mr. Palmer, Mr. and Mrs. Anderson, Mrs. Waggoner and myself.

"Q. Now, go ahead and state fully as you can what occurred at that time.

"A. Well, after we shook hands, why, he turned to me and he said, 'Well, I suppose you girls know what you are over here for.' Well, I told him I supposed it was to sign those papers or look over those papers he had for his final accounting of my mother's

estate, and he said yes. And he said that it was going to work a terrible hardship on him to have to pay us what we had coming from mother's estate. He said that he would have to draw in part of his mortgages and if he did that, that meant that he would have to go out and go to work. And I told him that we didn't want him to do anything of that sort at all. Well, he said he couldn't see any other way and I said, 'Well, Jim, isn't there any other way at all that this can be settled without all of this expense?' He complained of the court expenses it would cost him; and he said well, there was only one way that it could be done, and I asked him what it was. 'Well,' he said, 'the only way you can do is to sign over your interest in your mother's estate to me and trust me to do the right thing for you girls.' I said, 'We have always trusted you and I don't see any reason why we shouldn't now, but,' I said, 'you want to remember if we sign this all over to you and anything happens to you, all of this will go to your sister,' and he said, 'Yes, I know that, but I will make a will—I will leave all of my property to you girls when I am through with it.' He said, 'The understanding has always been between your mother and I that whichever went first, the other one was to have the use of the property as long as we lived, and when we were through with it, it was to go to you girls.' I told him I knew it, that was the understanding we always had, but we girls wasn't wanting him to draw in his mortgages to pay the money then, we just wanted everything fixed up so it would be safe and be right. He said that is what he wanted, too. He said, 'If you girls will do this for me, then,' he says, 'I will see that everything is left in proper condition for you girls. After I am through with it all, it will be left so that it will all be yours.'

"Q. Now, do you remember when Mr. Johnson came into the meeting?

"A. Yes; Mr. Johnson came in a little later, and if I remember rightly, I think I introduced him to Mr. Palmer and they talked for a few minutes, because Mr. Palmer had remembered Mr. Johnson from several

years back and they talked about that a few minutes, and then Mr. Johnson took these papers that were to be signed. Mr. Hall hadn't come in yet, he was busy, and he asked about these; he said we had better get to work; he said, 'We can be looking them over while we are waiting for Mr. Hall,'' and Mr. Palmer spoke up and said, 'I don't know as it will be necessary, we have come to an agreement here and everything is satisfactory to everyone,' and Mr. Johnson asked how and he told him what we had done, that we girls were going to sign over everything to him to have the use of as long as he lived and that when he was through with it all, he would make a will and everything would come back to us, and Mr. Johnson said that was fine, that is the way it should be done, that was a good way to settle it.

"Q. Did Mr. Johnson say anything about what you girls would have to do, what kind of papers you would have to sign?

"A. Well, he explained to Mr. Palmer about that, that he would have to draw up those papers and assignments and things of that sort. I don't remember just all of that, but he would have to fix up papers and fix up this agreement that we had made with him, we would have to fix those all up and we girls would sign them, that he would approve them before we signed them and see that everything was all right.

"Q. What did he say to Mr. Palmer about his— did he say anything to Mr. Palmer at that time about his making the will?

"A. Yes, he did; he told Mr. Palmer, 'Then the proper thing for you to do, if these girls carry out their agreement with you,' he said, 'then the right thing for you to do is to make a will and see that everything will be left in good order and safely for them,' and he said, 'That is exactly what I am going to do.'

"Q. Well, do you remember about Mr. Hall coming in afterwards?

"A. Yes. When Mr. Hall came in, Mr. Palmer, I am quite sure, turned around to him and said, 'Well,

Mr. Hall, we have settled everything without you.' He said he had found out that we girls were willing to do the right thing by him and that we didn't have any hard feelings toward him in any way over mamma's estate and that he wanted to do the right thing by us in return and that we were going to sign all of our rights to her estate over to him to have the use of as long as he lived, and then,' he said, 'I am going to make a will leaving everything to the girls when I am through with it; I will leave all my property to the girls when I am through with it.' Mr. Hall said, 'Fine.' He said, 'That is the right way to do it.'

"Q. Did he make any remark at that time complimentary to you girls for doing that?

"A. Yes, he did.

"Q. What did he say?

"A. He said, 'You should be proud of your step-daughters to think they will do that much for you,' and Mr. Palmer said that he was and he always had been."

Mrs. Waggoner, Mr. and Mrs. Anderson testified substantially to the same state of facts.

Mr. J. J. Johnson, the attorney for the three women, testified that he came in a little later and Palmer told him in substance what he and his stepdaughters had agreed to, being practically the same as detailed in the testimony of Mrs. Webb. He testified that Mr. Hall was not in at the time, but came in later. That he, Johnson, after remarking that the arrangement was a happy solution of the matter, said: Of course, you girls understand that you will have to make assignments of your interests over to Mr. Palmer," and that he said to Mr. Palmer, "Of course, Mr. Palmer, you realize that you will have to make a will so that at your death whatever property you had would, of course, go to the girls," and he said, 'That is exactly what I have agreed to do.' * * * Then about that time Mr. Hall came in." He also corroborated Mrs.

Webb in her statement that she told her stepfather that if he needed the property during his lifetime, he could use it.

In fact, we have the direct and positive testimony of Mrs. Webb, Mrs. Waggoner, Mrs. Anderson, Mr. Anderson and Mr. Johnson to the fact that Mr. Palmer agreed that, if the three stepdaughters would assign to him their interest in their mother's estate, he would make a will devising to them all the property of which he might be possessed at his death. In addition to this, we have the testimony of Mr. Sibbald, an attorney at Kelso, who took Mrs. Webb's acknowledgment of the assignment of the heirs in the presence of Mr. Palmer. On that occasion Mr. Palmer, in substance, said to him:

"That his wife, who was the mother of Mrs. Webb, as I took it, had died and there was some estate to be settled and the girls, as he called them, wanted to give him the estate; that he should have the use of all of it, and that he was going to protect them by making a will which in turn would give them the estate at his death."

This testimony coming from a witness, who can have no possible interest and who never saw any of the parties prior to the time of taking Mrs. Webb's acknowledgment, is of peculiar value.

The testimony of Mrs. Burlingame is to the effect that on Saturday before his death, or the ensuing Monday, he said that the girls wanted him to have the property as long as he lived, and then everything was to go back to them, and that "he was going to see that they got all the property."

The crowning act of confirmation was performed by Palmer himself. On Tuesday, after returning from Kelso where he had obtained Mrs. Webb's signature to the papers completing the transaction of the interest

of the heirs to himself, he committed suicide by shooting himself. On a writing tablet on the table was written these words in his own handwriting and signed by him: "Everything for the girls Lois, Sylvia and Stella, James H. Palmer." This was probably his last conscious act except the final rash deed that ended his life.

■ If ever an intent to make one the recipient of another's bounty or justice was proven in court, the intent of James H. Palmer to leave everything to his stepchildren is proven here, not as a will, but, as the completion of a contract. But this is not all. The oral agreement was made on Thursday. Pursuant to it, and about Friday or Saturday, Palmer directed his attorney to prepare a tentative will which practically was along the lines indicated by the agreement as detailed by the evidence above referred to, except that $1,000 was to be given to Mrs. Woodcock, possibly as an afterthought, or in the hope thereby to prevent litigation. But, with this small exception the draft prepared at his suggestion, with his alleged, and, we think clearly proven promise, and with his intention as indicated by the last words he ever wrote, "everything for the girls," fully establishes the contract.

It is true that Mr. Hall's account differs from the account given by Stella, Lois and Sylvia and by Anderson and Johnson, but this is no doubt accounted for by the fact, as testified to by these witnesses, that Mr. Hall came into the room after the others, and after the real agreement had been substantially made. Not questioning Mr. Hall's intent to detail truly what occurred, it should be remembered that he was and is a busy man and that nearly three years had elapsed between the time the alleged conversation occurred

and the date when he appeared on the witness stand. The fact that he disagreed with every other witness as to the substance of the agreement; the fact that he drew a draft of a will differing only in one small particular with the agreement related by the witnesses, and the further fact that the last writing that Palmer penned was a statement that corresponded in every particular with the agreement as the plaintiffs and their witnesses give it, convinces us beyond a doubt of the truth of their statements.

There is practically no testimony that Palmer was forced into the agreement against his will. No doubt he was surprised and somewhat hurt when he was informed that the heirs were claiming some immediate interest in the estate; but he seems to have gotten over this when he found they were right and to have been in a friendly and affectionate state of mind when he found they were not pressing him for an immediate payment of money, but were content to take anything he might have left after using and conserving it as he saw fit.

The fact that he took his own life immediately or a short time after the agreement was consummated may have had some psychological connection with the transaction, or it may not. The taking of his own life may have been the impulse of a moment or the determination of a lonesome man, who thought, that now having arranged his earthly business satisfactorily, he would rejoin a blessed wife in another world, we cannot say. Outside of the fact itself, there is no evidence of insanity, and there was certainly none apparent to his friends and associates.

Decree affirmed.

COSHOW, C. J., RAND and ROSSMAN, JJ., concur.